**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | |
|---|---|
| **BRYCE R. SCOTT,** ) | |
| ) | |
| **Plaintiff,** ) | |
| v. ) | Case No. 09-CV-1189 |
| ) | |
| **CITY OF PEORIA, a Municipal Corporation,** ) | |
| **et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## OPINION

This case is before the court for ruling on the Motion for Summary Judgment (#78) filed by Defendants, Gerald W. Suelter, Timothy L. Wight, Jeremy J. Layman, James A. Krider, Andrew Smith, and Conor Wowra, and the Motion for Summary Judgment (#79) filed by Defendant, the City of Peoria (City). This court has carefully considered the arguments of the parties and the exhibits filed. This court notes that Plaintiff, Bryce R. Scott, did not file a response to the City's Motion for Summary Judgment. Following this court's careful and thorough consideration, the City's Motion for Summary Judgment (#79) is GRANTED and Defendants' Motion for Summary Judgment (#78) is GRANTED in part and DENIED in part.

## FACTS[1]

On May 3, 2008, Defendants Suelter, Wight, Layman, Krider, Smith and Wowra were

---

[1] The facts are taken from the Statement of Undisputed Material Facts listed by Defendants, the Additional Material Facts listed by Plaintiff and the exhibits provided by Defendants, including deposition transcripts and the video recording of the incident. This court has only included facts which are supported by the record and are material to the issues raised in this case.

on-duty police officers employed by the City and were acting under color of law. In the early morning hours of that day, Plaintiff, who is African American, returned from visiting relatives in Rock Island and drove to the house of his girlfriend, Maria Russell, at 2140 N. Maryland in Peoria. Plaintiff parked in front of the house, roughly in the middle of the block, facing southbound. Plaintiff attempted to call Maria's house phone and cell phone several times, but she did not answer. Anita Smith, Maria's mother, also lived at the house. She contacted police dispatch and reported that they were having problems with her daughter's boyfriend, who was parked outside.

Layman heard the dispatch and volunteered to respond because he was nearby. Plaintiff saw a police car in front of him on a cross street pull into the intersection and then back up. Plaintiff then saw a second police car in his rear-view mirror approaching him from behind. Layman pulled up behind Plaintiff's car. The first squad car pulled up right next to Plaintiff's car and turned its spotlight on, illuminating Plaintiff's car. Plaintiff held up his phone and said, "I'm on the phone." The officer who spotlighted Plaintiff's car then got out of his squad car and was holding a billy club. Plaintiff immediately took off and started to drive away.

Layman activated his emergency lights and siren and followed Plaintiff's SUV. Layman's squad car recorded video of the events from near the beginning of the pursuit until the conclusion of the altercation with Plaintiff, beginning at approximately 3:33 a.m. During the pursuit, Plaintiff ran two stop signs and was driving well in excess of the speed limit in a residential area. Plaintiff admitted during his deposition that he was "going fast." Plaintiff

testified that he "was fleeing a little from the police" and was trying to get away. During the pursuit, Layman began to back off and Lieutenant Whitledge directed officers to terminate the pursuit. Just after 3:34 a.m., Plaintiff stopped his SUV when he reached a lighted area near Woodruff High School. Plaintiff testified that he decided to stop at that point because "[i]t was lit up in that area."

Layman announced over the radio that the suspect had stopped. Layman stopped his squad car on the driver's side of Plaintiff's vehicle with the squad car turned slightly toward Plaintiff's vehicle. Layman got out of his squad car, drew his service weapon and instructed Plaintiff to put his hands out of the car, which Plaintiff did. Layman then instructed Plaintiff to turn the vehicle off, which Plaintiff did. Wight arrived and parked his squad car behind Plaintiff's SUV. Wight approached the driver's side of Plaintiff's SUV, walking between Layman's squad car and Plaintiff's vehicle. Wight sprayed OC spray into the driver's side window of Plaintiff's SUV. On the video, at the time marked 03:34:34, the mist from the OC spray going past the driver's side of Plaintiff's SUV is visible. Plaintiff testified that his eyes were distorted from the spray and he could not see.

Wowra arrived after Wight, parked on the passenger side of Plaintiff's SUV, walked around the back of Plaintiff's SUV, and approached between the two vehicles. At approximately 3:34:40, officers grabbed hold of Plaintiff's hands and held them outside the car. Layman had holstered his weapon and grabbed Plaintiff's arm. Krider and Suelter arrived after Wowra. The video showed that, at 3:34:49, Suelter approached after coming around the front of the car and had his taser out. At 3:34:53, the officers opened the door of

the SUV and passed Plaintiff's hands through the window. Krider then came around the front of the SUV. At 3:34:57, Plaintiff came out of the SUV. Wight and Wowra then held his arms. Layman stepped back to provide cover to the other officers. Layman did not have any further physical contact with Plaintiff and was not involved in handcuffing him.

Wight and Wowra took Plaintiff and placed him face down on the ground. Wight was on Plaintiff's right and Wowra was on his left. Plaintiff does not recall what part of his body touched the ground first. After he was taken to the ground, Plaintiff is no longer visible on the video taken by Layman's squad car. For purposes of Defendants' Motion for Summary Judgment, it is undisputed that Plaintiff did not resist and did not struggle with the police. The officers and Plaintiff were on the ground in a very confined area between Plaintiff's SUV and Layman's squad car. Suelter approached Plaintiff with his taser and reached toward Plaintiff. At 3:35:03, Plaintiff yelled out. At 3:35:05, Suelter stood up and the taser was visible in his hand and not in contact with Plaintiff. The taser was in contact with Plaintiff for no more than three seconds. The first application of the taser was a "drive stun" to Plaintiff's calf.[2]

At 3:35:09, Suelter appeared to reach in a second time with the taser and withdraws

---

[2] In "drive stun" mode, the operator presses the taser to a subject's body and then pulls the trigger to emit a current and the deployment lasts as long as the trigger is pulled or for a maximum duration of five seconds. See Cyrus v. Town of Mukwonago, 624 F.3d 856, 859 n.1 (7th Cir. 2010). The use of a taser in drive stun mode causes temporary, localized pain in contrast to the use of a taser in dart mode which involves embedding a barbed electrical probe into the person's body and causes muscular contractions and more severe pain. See Brooks v. City of Seattle, 599 F.3d 1018, 1026-28 (9th Cir. 2010), vacated on other grounds in Mattos v, Agarano, 661 F.3d 433 (9th Cir. 2011).

4


it into view of the camera again by 3:35:11, so the taser was in contact with Plaintiff for no more than two seconds. The second use of the taser was a "drive stun" to Plaintiff's lower back. Plaintiff was tased three times by Suelter, the third time was a "drive stun" to Plaintiff's shoulder blade. During this time, Smith arrived from the opposite direction and parked toward the front of Plaintiff's SUV. At 3:35:15, Krider knelt down on Plaintiff's leg, Layman put his hand on his gun, and Smith was approaching. It is undisputed that Krider sat or knelt on one or both of Plaintiff's legs. Krider did not take any action to subdue Plaintiff other than sitting on his leg.

While Plaintiff was on the ground, Wight punched Plaintiff in the face. Wight testified that Plaintiff grabbed his inner thigh and squeezed and he punched Plaintiff to make him let go. Plaintiff testified that the officer who struck him (Wight) said "I'm going to teach you niggers about running from us." Smith saw Plaintiff on his stomach with his feet toward the front of his car. At 3:35:17, Smith began delivering foot strikes to Plaintiff's legs. Plaintiff testified that he felt someone "stomp" on his legs. The video shows Smith stomping on Plaintiff's legs at least 20 times. At 3:35:48, the video was turned off. The entire incident from the time the video came on during the chase until the video was off was approximately two and one half minutes. Smith asked for a Sergeant to come to the scene because a taser was used. Plaintiff was handcuffed and stood up by Wight and Wowra. Once the officers stood Plaintiff up, there was no further use of force.

Plaintiff testified that, after he was stood up, he asked the officers, "Why you all whoop me like this?" and one of the officers responded that, "All the ass whippin' we just

gave you, nigger, ain't nothing like the ass whippin's we give the niggers on the south end." Photographs were taken of Plaintiff which fairly and accurately depict his condition after the incident. As a result of the altercation with the officers, Plaintiff had a cut above his eye, taser marks, several scrapes, and a stinging sensation in his eyes from the OC spray. The scrapes were on Plaintiff's legs and right shoulder.

Plaintiff testified that one of the officers threw water in his face. Wight testified that he poured water from a water bottle on Plaintiff's face to rinse off the pepper spray. An ambulance was called. Plaintiff was taken to the ambulance, where his face was wiped off. The cut above his eye did not require any stitches and, in fact, had stopped bleeding before the ambulance arrived. Plaintiff received no treatment for any physical injuries and did not ask to be taken to the hospital from the scene. At the jail, Plaintiff was "cleaned up," but was not given any other medical treatment. Plaintiff did not fill out any sick call requests at the jail.

## PROCEDURAL HISTORY

On January 13, 2009, Plaintiff filed a complaint against Defendants in the circuit court of Peoria County. Plaintiff alleged only state law causes of action in his initial complaint and first and second amended complaints. On April 28, 2009, Plaintiff filed a Third Amended Complaint, which included federal claims. On May 27, 2009, Defendants filed a Notice of Removal (#1) and removed the case to the Central District of Illinois, Peoria Division. Plaintiff's Third Amended Complaint was 48 pages long and included 14 separate counts. The case was assigned to United States District Judge Michael M. Mihm.

On July 23, 2009, Judge Mihm recused himself from the case and it was assigned to United States District Judge Joe Billy McDade. On August 25, 2009, Defendants filed a Motion to Stay Civil Proceedings (#22). Defendants stated that Plaintiff's complaint alleged that they used excessive force during a May 3, 2008, traffic stop. They further stated that Defendants Suelter, Smith and Layman were indicted on criminal charges arising out of the May 3, 2008 incident. Defendants asked that the civil case be stayed pending the resolution of the criminal matter. On September 22, 2009, Magistrate Judge John A. Gorman granted the Motion to Stay.

On November 2, 2009, Plaintiff's counsel filed a Motion to Withdraw as Attorney (#23), which was granted by Judge Gorman. On November 19, 2009, attorneys from the law firm of Loevy & Loevy entered their appearances (#25, #26, #27, #29) on behalf of Plaintiff.

On May 17, 2010, Judge McDade recused himself from this case and, on May 27, 2010, the case was assigned to this court. On October 15, 2010, Judge Gorman held a status conference. At the status conference, Judge Gorman was informed that the criminal trial would be held in November. Judge Gorman ordered the case to remain stayed. On December 13, 2010, Judge Gorman held a status conference and ordered the stay lifted.[3]

On January 4, 2011, Plaintiff, having been allowed leave by this court, filed his Fourth Amended Complaint (#40). The Fourth Amended Complaint is six pages long and does not include separate counts. In the Complaint, Plaintiff stated that the action was

---

[3] Based upon the transcripts of deposition testimony, Defendant Smith was tried and acquitted and the charges against Layman and Suelter were then dismissed.

brought under 42 U.S.C. § 1983 and under Illinois state law. Plaintiff alleged that "Defendant Officers viciously beat Plaintiff, without justification, and while using racial epithets, all of which was caught on videotape." Plaintiff alleged that, on May 3, 2008, the Defendant Officers initiated a traffic stop of his automobile in Peoria, Illinois. Plaintiff alleged that, although he complied with the Officers' commands, Wight sprayed his face with pepper spray, Wight and Suelter applied three taser shocks to his back and leg, Wight struck him in the face with a fist, and Smith repeatedly stomped and kicked Plaintiff. Plaintiff further alleged that Layman, Krider and Wowra watched Suelter, Wight and Smith pepper spray, punch, stomp, kick and taser Plaintiff and did nothing to intervene or stop the conduct, despite having an opportunity to do so.

Plaintiff alleged that Defendants violated Plaintiff's constitutional rights, causing him damage. Plaintiff alleged that the misconduct was "objectively unreasonable, and undertaken with malice, willfulness, and reckless indifference to the rights of others." Plaintiff further alleged that the misconduct "was motivated by racial animus and constituted purposeful discrimination." Plaintiff alleged that the City proximately caused the violation of his rights "by maintaining policies and practices which were the moving force driving the foregoing constitutional violations." Plaintiff also alleged that the City's "widespread practices, so well-settled as to constitute *de facto* policy in the City of Peoria, were able to exist and thrive because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it."

Plaintiff further alleged: that Defendants engaged in purposeful discrimination in

violation of the Illinois Civil Rights Act of 2003, 740 Ill. Comp. Stat. 23; that Defendants' conduct constituted the Illinois common-law tort of conspiracy because they intentionally entered an agreement to violate Plaintiff's rights and took unlawful steps in furtherance of that agreement in the manner set forth above; and that Defendants' conduct constituted the Illinois common-law torts of assault and battery in that they intentionally and unlawfully threatened and committed violence upon Plaintiff. Plaintiff sought compensatory damages and attorneys' fees from Defendants and the City, along with punitive damages against the Defendants in their individual capacities.

Defendants and the City moved to dismiss Plaintiff's Fourth Amended Complaint. On February 17, 2011, this court entered an Opinion (#50). This court granted, in part, and denied, in part, the Motions to Dismiss. Following this court's Opinion, the following claims against Defendants remained: (1) § 1983 claims for use of excessive force and failure to intervene in violation of the Fourth Amendment; (2) a § 1983 claim of a violation of his right to equal protection under the Fourteenth Amendment; (3) a state law civil conspiracy claim; and (4) state law claims for assault and battery. Plaintiff's § 1983 claim against the City also remained.[4]

On June 8, 2012, Defendants filed a Motion for Summary Judgment (#78) with attached supporting exhibits. Defendants conceded that the excessive force and battery

---

[4] This court notes that it stated in its Opinion (#50) that a claim against the City remained for violation of the Illinois Civil Rights Act of 2003. In reviewing Plaintiff's Fourth Amended Complaint (#40), this court concludes that Plaintiff only alleged a claim under § 1983 against the City.

claims against Wight, Suelter and Smith present factual questions to be resolved at trial. Defendants argued, however, that they were entitled to summary judgment on the failure to intervene and battery claims against Layman, Krider and Wowra, the equal protection claim and the state law conspiracy claim. Also on June 8, 2012, the City filed a Motion for Summary Judgment (#79) and a Memorandum of Support (#80) with attached exhibits. The City argued that Plaintiff's claims against the City under § 1983 and Monell v. New York Dep't of Soc. Serv., 436 U.S. 658 (1978) fail because the undisputed facts and the record do not establish that the City or its policymakers were indifferent to Plaintiff's constitutional rights in the training, oversight, investigation, or discipline of its police officers or that there was an explicit or *de facto* widespread practice of the use of excessive force by police officers in the City. The City asked this court to enter summary judgment in its favor as to Plaintiff's § 1983 claim against it.

On July 13, 2012, Plaintiff filed a Response to Defendants' Motion for Summary Judgment (#84). Plaintiff did not file a Response to the City's Motion for Summary Judgment. On July 18, 2012, Defendants filed a Reply to Plaintiff's Response (#85).

ANALYSIS

I.  SUMMARY JUDGMENT STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court "has one task and one task only:

to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); O'Leary v. Accretive Health, Inc., 657 F.3d 625, 630 (7th Cir. 2011). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. If it is clear, based upon the undisputed facts, that a plaintiff will be unable to satisfy the legal requirements necessary to establish his case, summary judgment is not only proper, but mandated. See Celotex, 477 U.S. at 322; Padula v. Leimbach, 656 F.3d 595, 600-01 (7th Cir. 2011).

### THE CITY'S MOTION

The City contends that it is undisputed that "Plaintiff has produced no data, testimony, or other evidence prior to or during discovery to support his § 1983 and *Monell* claims" against the City. As noted, Plaintiff did not respond to the City's Motion for Summary Judgment.

Rule 7.1(D)(2) of the Local Rules of the Central District of Illinois provides:

> Within 21 days after service of a motion for summary judgment, any party opposing the motion must file a response. A failure to respond will be deemed an admission of the motion.

Rule 7.1(D)(2)(b)(6) provides that the "failure to respond to any numbered fact will be

11

deemed an admission of the fact." The Seventh Circuit has repeatedly held that such a rule is "entirely proper." Doe v. Cunningham, 30 F.3d 879, 882 (7th Cir. 1994). Therefore, when the non-movant does not respond to the movant's statement of facts, the non-movant concedes the movant's version of the facts. Waldridge v. American Hoechst Corp., 24 F.3d 918, 922 (7th Cir. 1994); Columbia Pictures Indus., Inc. v. Landa, 974 F. Supp. 1, 3 (C.D. Ill. 1997). However, a party's failure to submit a timely response to a motion for summary judgment does not automatically result in summary judgment for the moving party. LaSalle Bank Lake View v. Seguban, 54 F.3d 387, 392 (7th Cir. 1995); see also Archer Daniels Midland Co. v. Whitacre, 60 F. Supp. 2d 819, 823 (C.D. Ill. 1999). It remains "the movant's burden to demonstrate that no genuine issue of material fact exists and that he is entitled to summary judgment as a matter of law." Doe, 30 F.3d at 883. Accordingly, the district court must make the further finding that summary judgment is proper as a matter of law. LaSalle Bank, 54 F.3d at 392, quoting Wienco Inc. v. Katahn Assocs., Inc., 965 F.2d 565, 568 (7th Cir. 1992).

This court concludes that the City has shown that summary judgment in its favor is proper as a matter of law on Plaintiff's § 1983 claim against it. Accordingly, the City's Motion for Summary Judgment (#79) is GRANTED.

## DEFENDANTS' MOTION

Plaintiff has conceded that Defendants are entitled to summary judgment on his state law conspiracy claim and that Defendants Layman, Krider and Wowra are entitled to summary judgment on his excessive force and battery claims. Plaintiff contends, however,

that his claims against Layman, Krider and Wowra for failure to intervene and his equal protection claim should be allowed to proceed.

## FAILURE TO INTERVENE

Defendants argue that Layman, Krider and Wowra are entitled to summary judgment because the altercation was brief and Layman, Krider and Wowra did not have a realistic opportunity to intervene. In response, Plaintiff contends that there are factual questions regarding the opportunity to intervene that cannot be resolved on summary judgment. This court agrees.

An "officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation was committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." Abdullahi v. City of Madison, 423 F.3d 763, 774 (7th Cir. 2005), quoting Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994) (emphasis in original). A "'realistic opportunity to intervene' may exist whenever an officer could have 'called for a backup, called for help, or at least cautioned [the excessive force defendant] to stop.'" Abdullahi, 423 F.3d at 774, quoting Yang, 37 F.3d at 285. The Seventh Circuit "has made clear that the prongs of this analysis almost always implicate questions of fact for the jury: 'Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a

reasonable jury *could not possibly conclude otherwise.*'" Abdullahi, 423 F.3d at 774, quoting Lanigan v. Vill. of East Hazel Crest, Ill., 110 F.3d 467, 478 (7th Cir. 1997) (emphasis added); see also Montano v. City of Chicago, 535 F.3d 558, 569-70 (7th Cir. 2008) (summary judgment properly granted to two defendants on the plaintiffs' failure to intervene claims where the plaintiffs did not provide evidence that one defendant was even involved in the arrest and where there was no evidence that the other defendant had a realistic opportunity to prevent the alleged harm).

In this case, Layman, Krider and Wowra testified that, because of the crowded conditions between Plaintiff's vehicle and Layman's squad car, they did not see what the other officers were doing. Plaintiff has pointed out, however, that it is undisputed that Layman, Krider and Wowra were in close proximity to Plaintiff as he was subjected to Wight, Suelter and Smith's actions. It is also undisputed that Wowra held Plaintiff's arm, Krider sat on Plaintiff's legs, and Layman was watching and providing cover while these actions were occurring. This court concludes that a jury could conclude, consistent with the evidence, including the videotape, that one or more of the officers could have and should have attempted to prevent Plaintiff from being sprayed with pepper spray, tased three times, hit on the face and stomped on his legs. See Abdullahi, 423 F.3d at 774. This court further agrees with Plaintiff that there is no merit to Defendants' argument that Layman, Krider and Wowra cannot be liable for failure to intervene because Plaintiff was not seriously injured.[5]

---

[5] This court concludes that the law does not require life-threatening injuries to be inflicted before a defendant can be liable for failure to intervene. It is enough that excessive

Defendants have also claimed, in a one-page argument, that Layman, Krider and Wowra are entitled to qualified immunity regarding Plaintiff's failure to intervene claim. Defendants argue that these "officers could have believed, based upon what they were able to see, that the force used during the brief altercation was a reasonable effort to gain control of [Plaintiff], who had just led Officer Layman on a high-speed chase, and that they did not need to intervene on [his] behalf." Plaintiff argues that, because there is a dispute in this case about the amount of force used and the reasonableness of that force, this court cannot decide whether Defendants Layman, Krider and Wowra are entitled to qualified immunity as a matter of law.

The United States Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Thus, the doctrine of qualified immunity shields from liability police officers "who act in ways they reasonably believe to be lawful." Chelios v. Heavener, 520 F.3d 678, 691 (7th Cir. 2008), quoting Anderson v. Creighton, 483 U.S. 635, 638-39 (1987). "[I]n order to survive summary judgment on grounds of qualified immunity, a plaintiff must (1) allege violation of a valid legal right and (2) demonstrate that 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Abdullahi, 423 F.3d at 775,

---

force was being used and the defendant had a realistic opportunity to intervene. See Abdullahi, 423 F.3d at 774.

quoting Saucier v. Katz, 533 U.S. 194, 201-02 (2001). Thus, the Supreme Court has articulated the following two-part test for qualified immunity: "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendants violated a constitutional right; [and] (2) whether that constitutional right was clearly established at the time of the alleged violation." Chelios, 520 F.3d at 691, citing Saucier, 533 U.S. at 201.[6] "A plaintiff may discharge the burden of showing that the constitutional right was clearly established by showing that there is 'a clearly analogous case establishing a right to be free from the specific conduct at issue' or that 'the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights.'" Chelios, 520 F.3d at 691, quoting Smith v. City of Chicago, 242 F.3d 737, 742 (7th Cir. 2001).

This court agrees with Plaintiff that there are few constitutional rights more clearly established than the right to be free from excessive and unreasonable force. See Chelios, 520 F.3d at 691-92. In this case, for purposes of summary judgment, it is undisputed that Plaintiff did not resist and did not struggle with the police yet was sprayed with pepper spray, punched in the face, tased three times and kicked/stomped on. This court agrees with Plaintiff that these facts, if proved at trial, would support a finding that, in failing to intervene, Layman, Krider and Wowra's conduct was unreasonable under the circumstances and violated Plaintiff's clearly established constitutional right to be free from excessive and

---

[6] This court notes that, while the Court in Saucier stated that the first part of the test must be considered before the second, this sequence is no longer regarded as mandatory. See Pearson v. Callahan, 555 U.S. 223, 236 (2009).

16

unreasonable force. This court cannot conclude, as a matter of law, that a reasonable officer in the position of Layman, Krider and Wowra could not have known that the actions of the other officers violated Plaintiff's rights so that intervention was warranted. This court therefore concludes that this is a fact question not appropriate for summary judgment. See Abdullahi, 423 F.3d at 774-75.

Therefore, for all the reasons stated, Defendants Layman, Wowra and Krider are not entitled to summary judgment on Plaintiff's failure to intervene claim.

## EQUAL PROTECTION

Defendants contend that they are entitled to summary judgment on Plaintiff's equal protection claim because "[t]he use of racially derogatory language, while unprofessional and deplorable, does not violate the Constitution," quoting DeWalt v. Carter, 224 F.3d 607, 612 (7th Cir. 2000). Defendants have also pointed out that, while Plaintiff testified that the first racial epithet was said by the officer who struck him in the face and Wight has admitted he was the officer who struck Plaintiff, there is no evidence which would tie the alleged use of a racial epithet to any of the other Defendants. In response, Plaintiff has pointed out that he has alleged both racially derogatory language and unreasonable force being applied together. Plaintiff argues that it was the usage of the epithet "nigger" on two different occasions coupled with the use of brute force that constitutes a denial of equal protection. Plaintiff contends that, based on the undisputed facts, Wight is not entitled to summary judgment on Plaintiff's equal protection claim and, with respect to the other Defendants, summary judgment is not appropriate at this time as the jury will need to determine which of the

17

Defendants, if any, uttered the second racial epithet toward Plaintiff. In their Reply, Defendants note that, in the video, none of them can be seen or heard using any racial epithet.

To succeed on his equal protection claim, Plaintiff must demonstrate that a state actor intentionally discriminated against him due to his membership in a protected group. See Gutierrez v. City of Indianapolis, ___ F. Supp. 2d ___, 2012 WL 3308994, at *11 (S.D. Ind. 2012), citing Sherwin Manor Nursing Ctr., Inc. v. McAuliffe, 37 F.3d 1216, 1221 (7th Cir. 1994). In addition, in establishing discriminatory effect, Plaintiff must show that similarly situated individuals were otherwise treated differently. See Gutierrez, 2012 WL 3308994, at *11. "The Seventh Circuit, as well as other circuit courts, has consistently articulated that the isolated use of racially derogatory language, while deplorable, does not rise to the level of a constitutional violation." Gutierrez, 2012 WL 3308994, at *11 (listing cases). However, the use of racial slurs along with some other conduct that deprives an individual of established rights may violate equal protection. See Gutierrez, 2012 WL 3308994, at *11. The court in Gutierrez noted that, in DeWalt, the Seventh Circuit suggested that the use of racially derogatory language is "strong evidence of racial animus, an essential element of any equal protection claim." Gutierrez, 2012 WL 3308994, at *11, citing DeWalt, 224 F.3d at 612 n.3. The court in DeWalt also stated that the use of racially derogatory language "can be quite important evidence of a constitutional violation." DeWalt, 224 F.3d at 612 n.3.

In this case, Plaintiff testified that two racially derogatory remarks were made to him, one by the officer who struck him in the face and the second by an officer after the incident was over. In the second remark, the officer used racially derogatory language to tell Plaintiff

that the beating he received was much less severe than the beatings administered to other African Americans on the south side of Peoria. This court concludes that the racially derogatory remarks were made during and immediately after a time when Plaintiff was subjected to the use of force and strongly suggested that Plaintiff would have been treated differently if he had not been African American. See Gutierrez, 2012 WL 3308994, at *11, citing Burton v. Livingston, 791 F.2d 97, 100 (8th Cir. 1986). This court therefore concludes that Plaintiff has set forth sufficient evidence to indicate that his constitutional rights were violated under the Fourteenth Amendment because the use of such language combined with Defendants' conduct may amount to an equal protection violation. See Gutierrez, 2012 WL 3308994, at *11, citing DeWalt, 224 F.3d at 612 n.3. Accordingly, Defendants are not entitled to summary judgment on Plaintiff's equal protection claim.

IT IS THEREFORE ORDERED THAT:

(1) The City's Motion for Summary Judgment [79] is GRANTED. The City is terminated as a Defendant in this action.

(2) Defendants' Motion for Summary Judgment [78] is GRANTED in part and DENIED in part.

(3) Summary judgment is granted in favor of all Defendants on Plaintiff's state law conspiracy claim. Summary judgment is granted in favor of Defendants Layman, Krider and Wowra on Plaintiff's § 1983 excessive force and state law battery claims. Defendants remaining requests for summary judgment are denied.

(4) The case will proceed to trial on Plaintiff's § 1983 excessive force claims and

state law battery claims against Defendants Wight, Suelter and Smith, on Plaintiff's § 1983 claims of failure to intervene against Defendants Layman, Krider and Wowra, and on Plaintiff's § 1983 equal protection claim.

(5) The parties are directed to contact Judge Gorman to schedule a settlement conference.

(6) This case is scheduled for a telephone status conference before this court on February 8, 2013, at 9:00 a.m.

ENTERED this 17th day of December, 2012.


s/MICHAEL P. McCUSKEY
U.S. DISTRICT JUDGE